**LAMBERT et al. v. DEMPSTER BROS.,
Inc., et al.**

No. 244.

District Court, E. D. Tennessee, N. D.

Aug. 14, 1940.

Supplemental Opinion Aug. 26, 1940.

Donaldson & Montgomery, of Knoxville, Tenn., and Cyrus Kehr & Swecker, of Washington, D. C., for plaintiffs.

Frantz, McConnell & Seymour, of Knoxville, Tenn., and Cameron, Kerkam & Sutton, of Washington, D. C., for defendants.

DARR, District Judge.

This is a suit instituted by Walter E. Lambert and another against Dempster Brothers, Inc., et al. for the infringement of letters patent No. 2,062,227 granted to Lambert on November 24, 1936, from an application filed July 9, 1934.

The bill of complaint was filed by Walter E. Lambert in July, 1937, charging infringement of claims 6, 7, 13, 14, and 16 of said patent. Among other things it also charged certain stockholders, directors, officers, and agents with joint and several infringement with defendant corporation, and prayed that not only an injunction issue against these defendants but that an accounting for profits and/or damages be had.

Defendants answered the bill of complaint in October, 1937, denying most of the allegations thereof and setting up many of the usual defenses.

At or about the same time a consent order was entered by the court dismissing the suit as to defendant Charles M. Seymour.

In December, 1938, plaintiffs filed a supplemental complaint setting forth among other things the acquisition of an interest in said patent by McMurray Structural Steel Company, Inc., since the institution of the suit, and making it a party plaintiff to the suit.

That later another supplemental complaint was filed under order of the court and with consent of defendants, setting forth that the defendants had modified their construction but were continuing to infringe said patent and adding Lorene D. McMillan as a party defendant.

Defendants thereafter, by order of the court, amended paragraph 12, subparagraph (a), of their answer by adding the citations of certain prior art upon which they expected to rely. Very soon thereafter defendants filed an answer to the supplemental complaint and a counterclaim, whereupon plaintiffs filed a motion to dismiss or strike the counterclaim.

The counterclaim appears to be based upon two separate and distinct theories. The first is that by reason of a controversy with plaintiffs' patent owners over the ques-

tions of validity and infringement of certain claims of their patent by defendants they have the right to an adjudication of these questions by a counterclaim under the declaratory judgment provisions of the Federal statutes, 28 U.S.C. § 400, 28 U.S.C.A. § 400. The second is that this suit is without merit, and that the institution thereof by the plaintiffs has resulted in injury to defendants in the sale of their alleged infringing devices, and constitute such acts of unfair competition as would render them liable to defendants.

In connection with the first theory, careful study has been given to the line of cases including Link-Belt Co. v. Dorr Company, D.C., 15 F.Supp. 663; Meinecke et al. v. Eagle Company, D.C., 19 F.Supp. 523; Stadium Manufacturing Company v. Plymouth Corporation, D.C., 24 F.Supp. 779 and others, wherein it was indicated that such a counterclaim as the one involved herein was proper under the declaratory judgment provisions heretofore cited. All of these cases, however, appear to have been decided on motions prior to trial and appear to have proceeded primarily on the premise that defendant was entitled to an adjudication of the controversy, and that if the counterclaim were not allowed plaintiff might dismiss his suit before trial without an adjudication. However, Rule 41 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, would seem to offer ample protection to this defendant against the dismissal of the suit without an adjudication. Even if it were otherwise I do not feel that these cases are applicable to the present situation where the case has proceeded to and has actually been tried without any attempt on plaintiffs' part to dismiss.

It was early held in the case of Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246, that the Federal Courts could only take jurisdiction and decide matters which were in their nature "cases" or "controversies". The present statute cited above so limits the jurisdiction of this court in declaratory judgment proceedings. In the present case the question already before the court is as to the validity and infringement of certain claims of said patent, and complete relief can be accorded in this case without the necessity of the counterclaim. Hann v. Venetian Blind Corporation et al., D.C., 15 F.Supp. 372. There is no "case" or "controversy" either in the pleadings or proof with respect to the other claims of said patent, and without such the court would have no jurisdiction to adjudicate them as prayed in the counterclaim, especially since plaintiffs are bound by their election of claims in their pleadings and at the trial.

Following the second theory of the counterclaim, it is not alleged that there was any lack of good faith or probable cause on the part of plaintiffs in the institution of the present suit, nor are any acts of intimidation of customers or prospective customers on the part of plaintiffs charged in the counterclaim. The mere exercise of a legal right given to the owner of a patent by statute to bring suits to enforce his rights thereunder would not constitute unfair competition in the absence of the aforesaid elements. Emack v. Kane, C.C., 34 F. 46.

For all of these reasons and in view of the proof adduced at the trial, the counterclaim is found to be insufficient, without merit, and superfluous, and is therefore dismissed.

Plaintiffs have joined certain individuals as defendants claiming that they have jointly and severally infringed the patent in suit. However, at the end of plaintiffs' prima facie case the suit was dismissed as to two of these defendants, and a ruling was reserved on the liability of the other individual defendants. In connection with the recent case of Looper v. Colonial Coverlet Company, Inc., D.C., 29 F.Supp. 121, this court had occasion to review the authorities relating to the liability of individuals who are in some way connected with or interested in corporations who have committed infringements of patents. The rule appears to be that where an individual has acted in a supervisory capacity for the corporation in the making, using, or selling of the thing which is the subject of the infringement, or directs or has actively engaged in the infringement with the corporation or who fraudulently uses a corporation to commit acts of infringement for the purpose of shielding the wrongdoer from the consequences of his acts, such individual is liable with the corporation. On the other hand, individuals who do not operate other than as stockholders, directors, or officers of a corporation, but merely occupy such status, would not be individually liable. Telling v. Bellows-Claude Neon Company, 6 Cir., 77 F.2d 584, certiorari denied 296 U. S. 594, 56 S.Ct. 108, 80 L.Ed. 420; D'Arcy Spring Company v. Marshall Mattress Company, 6 Cir., 259 F. 236.

■ Applying these principles to the present case, it is seen that the proof only discloses the status and relation of some of the individual defendants to the defendant corporation showing that they were stockholders, officers, and directors, but it wholly fails to establish that these parties acted other than as mere stockholders, directors, or officers of the corporation or that their conduct was such as to bring them within the status of joint or several infringers. There is no substantial proof as to what relation the other defendants bore to the corporation.

For the foregoing reasons the case is dismissed as to all defendants except the corporation.

The patent in suit relates to motor vehicles for transporting material in bulk from one place to another and has particular usefulness in connection with the transportation of stone from a quarry to a crusher. It appears to have been the practice for years past to employ a cart, truck, or track and cars for this purpose. In their operations the men at the quarry would dig, blast, or otherwise remove stone or other materials and would load it upon the truck, car, or other device until filled, after which the material was transported to a crusher, storage place, or point where it was used. However, each time the vehicle was loaded or unloaded both it and the driver remained idle.

The loss in time and the added expense made it desirable that some more efficient form of transportation be devised, so the skip was employed to replace the usual bed of the vehicle. The advantage of this skip was that it could be attached to and detached from the vehicle when loaded or unloaded, if desired. In this way the workmen at the quarry or loading place would continuously load material into one or more of these skips, and the vehicle could continuously haul them to the dumping place. This, of course, greatly increased the efficiency of transportation, and provided the added advantage of permitting the workmen to load near the ground rather than having to lift the material up into a vehicle bed each time, thereby conserving their strength and increasing their loading capacity.

However, Lambert did not pioneer this field and by the time he entered it the art was well developed, examples of which may be found in such patents as Kalbough 1,-005,979 and Larner 1,547,592 and 1,774,895. In fact, the art had reached the stage of development were changes were made in small increments and invention was restricted to mere improvements. Such is particularly well illustrated by the slight improvement of Larner 1,547,592 over Kalbough, supra, and of Larner 1,774,895 over his earlier patent above cited, and this development is continuing as is seen from the more recent patent to Dempster 2,969,697.

It appears further from the proof that these devices had not come into general use in the trade, for Lambert and others who had been in the contracting business for years and who had been in intimate contact with the problems of transportation of road and building materials had never heard of their use until about the time Lambert and Dempster got up their devices. It has, however, been found that there were some isolated cases of the use of a conveyor or skip detachably carried by a motor vehicle. As early as about 1919 Larner used a motor vehicle for carrying a detachable skip, but its successful use was restricted to short distance hauling over a smooth surface and with a light load. Other instances of such use were of the same character.

It seems that the prior art generally and Larner in particular had been faced with two primary problems in adapting this device to use for general transportation, and that neither he nor anyone else had been able during all the years of use in these particular places to overcome these defects and adapt the device to general usefulness.

The two principal problems with which Lambert was faced was to provide a motor vehicle having a detachable skip which could be successfully operated over rough roads for long distances without losing part of the load or risking the upsetting of the skip, and which could be filled to capacity without impairing the dumping of the material and without greatly increasing the bulk or size of the supporting cables.

In doing this it appears that Lambert provided a skip of such form as it never had been thought could be adapted to such a combination for successful operation. This skip included an angular front wall which could not be efficiently dumped in a combination of the character of Larner. In adapting his skip to the combination Lambert provided a skid frame and produced a new cooperation between it and the skip. The form of skip permitted its being filled to capacity without fear of loss of its contents and without impairing the ease of dumping or loading, and the skids permit-

ted the skip to ride over them while being lifted into or lowered from position for or after transportation. . When in position the action of gravity and the supporting cables caused the skip to ride .on the skid frame which serves to carry part of the load and effectively acted as a stop to reduce or substantially eliminate swinging of the skip during transportation over rough surfaces and for long distances. So changing the structures of the prior art as to adapt old elements to such a combination and creating a new cooperation between such elements to overcome the defects in and problems of the prior art whereby a new result is produced, seems to be Lambert's contribution to the art in its broadest aspect. There are other very minor contributions such as the method of dumping by shifting the cables through hitching and re-hitching to the skip in a particular way, but not all of these features need be considered here since some of them are not involved in the present case.

■ The question is whether these relatively small but highly practical and important changes in a highly developed art are patentable. This question seems to have been particularly well treated by Chief Justice Taft in Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523, as follows: "In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the border line between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in approximate copies of the new device. It is this differing attitude of the courts toward genuine discoveries and slight improvements that reconciles the sometimes apparently conflicting instances of construing specifications and the finding of equivalents in alleged infringements. In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment. Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers; and certainly finds no reason to withhold from the really meritorious improver, the application of the rule 'ut res magis valeat quam pereat,' which has been sustained in so many cases in this court. Winans v. Denmead, 15 How. [330] 338, 341, 14 L.Ed. 717; Corning v. Burden, 15 How. [252] 265, 269, 14 L.Ed. 683; Turrill v. Railroad Co., 1 Wall 491, 510, 17 L.Ed. 668; [Providence] Rubber Co. v. Goodyear, 9 Wall. 788, 795, 19 L.Ed. 566; McClain v. Ortmayer, 141 U.S. 419, 425, 12 S.Ct. 76, 35 L.Ed. 800."

■ Under this and many other authorities I am convinced that the contributions made by Lambert to the art were real and substantial and resulted in a valuable, practical machine which the art had for years been unable to develop and therefore I am convinced that such contributions rose to the dignity of invention.

■ ■ A great many patents and publications have been introduced in evidence to establish that the various features of novelty of Lambert as expressed in the claims under consideration are old in the prior art. These various patents and publications have all been very carefully considered along with the history of the prosecution of this case before the Patent Office as disclosed in the patented file. However, it appears that most of these patents and publications were cited and considered by the Examiner in the prosecution of the application before the Patent Office and that the claims in question were allowed over them. The Examiner being an expert in the art, his decision on the questions of patentability and invention are entitled to great weight and respect. The law even recognizes a presumption of validity in the issued patent. Radio Corp. v. Radio Engineering Labs., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017; Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed 657; Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821. The prosecution of this case before the Patent Office seems to have been unusually active and the consideration by the Examiner exceptionally careful, and on further consideration I can find no error in the allowance of the claims in question over the art cited in the patented file.

Patents other than those cited by the Examiner in the prosecution of the Lambert application before the Patent Office have been called to the attention of the court for consideration on the ground that they were overlooked by the Examiner who would not have allowed the claims had he discovered them. A consideration of these patents, however, has convinced me that the reason the Examiner did not cite them was because they were not nearly as pertinent as the art of record in the application.

The patent to McCoy 546,426 relates to the movement of a series of portable buckets by means of an overhead crane which operates on a smooth track over short distances, and the buckets are permitted to freely swing while being carried. That system is used in ice plants where the problems are entirely different and the art is clearly not analagous.

The patents to Dunn 797,503, Frank 1,-973,950, Russell 1,359,841, Watt 1,819,578, Remde 1,713,780 and 1,768,149 and others relate to vehicles such as scrapes, trucks, and the like where the container is non-detachably joined to the vehicle and where the problems and the manner of their solution are foreign to the combination of the claims now under consideration.

Lance 916,331 relates purely to a dumping bucket which is adapted to narrow places and is used for the handling of such plastic materials as concrete and is freely movable from one position to another over short distances by flexible cables which permit the free swinging of the bucket. The patent is completely devoid of any suggestion as to how it could be associated with other elements to produce the new cooperation contemplated in the claims under consideration.

Compton 967,613 simply employs a scoop to ride over an inclined track from the ground up to a point above a frame of the vehicle where it is made to dump the contents thereof into the bed of such vehicle. The reference has no relation to the combination under consideration and is not nearly so pertinent as Gledhill 1,105,131 already considered by the Examiner. The same is also true of such other patents as Otterson 1,458,240, Clark 1,492,675, Coffman 1,728,-229, Silver 1,920,485 and Heeman & Froude (Br.) 17,457.

On the other questions relating to validity it appears that George Dempster had been for sometime urging upon his brother Will Dempster, with whom he had been associated in business, the necessity for manufacturing some item of equipment to supplement their other business, but had been unsuccessful until he suggested the manufacture of motor vehicles with detachable skips. In this connection George Dempster prepared sketches of a proposed device and Will Dempster prepared additional sketches from which a device was later constructed. George Dempster, who during part of this time was also employed as City Manager of Knoxville, Tennessee and later as State Commissioner of Finance and Taxation in Nashville, Tennessee, applied February 5, 1935, for a patent on his device, which application matured into patent No. 2,069,697 on February 2, 1937.

Although filed some months after the Lambert application it became co-pending with that application and the Examiner, finding common patentable subject matter in the two applications, set up an interference No. 72,059 to determine who was the prior inventor and therefore entitled to it.

In this interference George Dempster filed two separate sworn statements made in February and April, respectively, of 1936, and known to interference practice as the preliminary statements, in which he set forth that the first written description of the invention was not made until about September 12, 1934, and that the invention was not reduced to practice, that is, by constructing and successfully operating a device embodying the invention, until March, 1934.

The claims involved in that interference are the present claims 13, 14, 16, and 17 and include all but claims 6 and 7 of Lambert and which are under consideration in the present case.

It is noticed that neither George Dempster nor his counsel presented any motion in that proceeding challenging the validity of claims 13 and 14, but on the contrary drafted claims 16 and 17 and presented them to the Examiner stating that it was believed they were patentable, whereupon the Examiner after careful consideration agreed that these latter claims were patentable and added them to the interference.

George Dempster, the junior party to the interference, failed to offer any evidence that he was the prior inventor of the subject matter of those claims so the Patent Office entered judgment on the record and awarded them to Lambert.

 It was contended by plaintiffs that these issues are res adjudicata, and that the decision of the Commissioner in that proceeding is binding upon the court, but the

authorities are clearly otherwise. Union Paper-Bag Machine Company v. Crane, Fed. Cas.No.14,388, 1 Ban. & A. 494; Williams Company v. Miller, Du Brul &·Peters Mfg. Co., C.C., 107 F. 290; Davis & Roesch T. C. Co. v. National Steam Specialty Company, C. C., 164 F. 191; Turner Brass Works v. Appliance Manufacturing Company, ·C.C., 164 F. 195; Roth v. Harris, 2 Cir., 168 F. 279.

On the other hand the decision of the Commissioner, who is highly skilled in the handling of these questions, is entitled to great respect, and the interference is valuable in reflecting the conduct of George Dempster with respect to this invention, for the prior knowledge relied upon by defendants was that of George Dempster originating from his sketches and later the machine constructed in accordance with them, and finally the application for patent, which is, of course, the one referred to in the preliminary statements.

There is some evidence that a machine was constructed by Dempster Brothers, Inc., or its predecessors before the dates indicated in the preliminary statements of George Dempster, but all of this is based solely on the memory of witnesses, while the great preponderance of disinterested testimony establishes that it was some time after the Lambert device was in operation before defendant's first machine was constructed. The proof would even indicate that the discovery of the Lambert device by defendants or their agents was the thing that spurred or stimulated them to construct their machine, and that even if defendants, and particularly George Dempster, had such an idea before that time they were not in any way diligent in reducing it to practice.

On the whole the greater weight of the evidence is in complete harmony with preliminary statements in the interference, as would be expected, since they were made several years before the trial of this case when all of the facts were fresh in the memories of the parties. For these reasons, and in ·view of both the strong oral and documentary proof adduced by plaintiffs in support of their dates of conception and reduction to practice of the Lambert device, I am of the opinion that Lambert was the first inventor of the subject-matter contained in the claims under consideration.

As a condition precedent to the right of a patent holder to maintain an action for infringement of his patent, it must be established that the defendant has committed some act of infringement after the patent issued, prior to the institution of the suit, and before the expiration of the statute of limitations. It does not appear that the structures exemplified by exhibits A, B, and C were made, used, or sold by Dempster Brothers, Inc., after the issuance of the patent in suit and therefore no right of action can be predicated on them. However, if a right of action otherwise exists, then any injunction which might issue could cover any infringing structure, and if these forms constitute infringements of this patent, the injunction would extend to and cover these forms so far as infringements occurring thereafter are concerned.

In considering the question of infringement, it is recognized that in order for infringement of a claim to occur the alleged infringing structure must satisfy the claim, element for element, and limitation for limitation, and that in construing the terms of a claim due consideration should be given the prior art and the history of the prosecution before the patent office to ascertain the scope of the invention.

On this basis I am of the opinion that claims 6 and 7 of Lambert, supra, are infringed by the forms depicted in exhibits D, E, and F. All of these relate to a conveying device of the character contemplated by these claims. Each of them clearly shows an upright skid frame mounted on the rear of a motor vehicle with a cross-bar in the form of a shaft or axle bridging the upper ends of the frame and supported by it, and extending on laterally through and beyond it, and with means in the form of nuts, set screws, or other appropriate mounting means for suspending sheaves at the opposite ends of the cross-bar, and the means are spaced laterally on the outside of the frame. They all disclose supporting bars running along and supported by the motor vehicle frame, and these bars are connected to the lower end of the skid frame. Also each of the exhibits employs braces which extend between the upper end of the skid frame and to substantially the opposite ends of the supporting bars.

While the drawings of the patent disclose the use of a specific type of guide means or sheaves mounted in a specific manner on the cross-bar, this, of course, is a mere preferred embodiment of the invention, for the claims are not so limited, and a study of the patented file and prior art clearly show the invention is not so limited.

Also claims 13 and 14 are infringed by the form exemplified by exhibits D and H,

for instance, in applying claim 13 to form H it is seen that an upright skid frame is mounted on the rear of a motor vehicle chassis over which skid frame a skip of the character recited in the claim is adapted to ride with flexible cable means carried by the vehicle chassis rearwardly of the skip and detachably connected to the end walls of the skip for elevating it along the skid frame and so holding it during transportation. The boom carried by the chassis is the guide means from which the cable means extend, while the hook acting through the bale and associated mechanism serves as the tilting means.

Claim 16 is infringed by only forms D, E, and F as will be seen from the analysis and consideration heretofore given.

I find no infringement of the other devices exemplified in the other exhibits under consideration for they either fail to incorporate all of the vital elements of the claims or fail to meet the indispensable limitations thereof, and on further ground that they have substantially a different law of operation not contemplated by the Lambert invention.

An order will be prepared in conformity to this opinion.

### Supplemental Opinion.

It has been called to my attention that in the original opinion I overlooked passing upon claims 11 and 15, which seems to have been brought in by the supplemental bill of complaint, in connection with the stipulations dated June 9, 1939.

It is my judgment that the plaintiffs have failed to establish any infringement of these claims and it is, therefore, unnecessary to consider their validity.